**Pedro O. FUENTEZ, Jr., Appellant,**

v.

**STATE of Texas, Appellee.**

No. 11–05–00185–CR.

Court of Appeals of Texas, Eastland.

June 8, 2006.

H. Thomas Hirsch, Odessa, for appellant.

Al Schorre, Dist. Atty., Eric Kalenak, Asst. Midland County Dist. Atty's Office, Midland, for appellee.

Panel consists of WRIGHT, C.J., and McCALL, J., and STRANGE, J.

## OPINION

RICK STRANGE, Justice.

The jury convicted Pedro O. Fuentez, Jr. of two counts of indecency with a child by contact. The jury then assessed a sentence of five years confinement and a fine of $1,750 and recommended that Fuentez's confinement be suspended and that he be placed on community supervision. The trial court suspended Fuentez's confinement, placed him on community supervision for ten years, and fined him $1,750. We find no error and affirm.

### Background Facts

Fuentez, Elizabeth Sandoval, and Samantha Julie Hernandez went to a dance at the Los Arcos Club in Odessa. They started drinking before the dance and continued drinking while at the dance. They left the dance around 2:00 a.m. and drove to Mark Reyes's house in Midland. Sandoval was dating Mark, and she and Hernandez were planning on spending the night at his house. Mark lived with his brother, Roman Reyes, his ten-year-old daughter, V.R., and his son, I.R.

When Fuentez, Sandoval, and Hernandez got to the house, other people were already there. Most of the adults, including Fuentez, were intoxicated. Everyone had a few more drinks. Sandoval and Mark eventually went to bed. Others left. Hernandez laid down on a couch. Fuentez told her that he was going to rent a motel room. Hernandez heard the front door, and she went to sleep. When Hernandez woke up, she went to the bathroom. She saw V.R. come out of a bedroom crying and run into Roman's bedroom. Hernandez heard V.R. tell Roman that a man was touching her and kissing her. Hernandez then turned and saw Fuentez. He was nude except for his socks. Hernandez heard Fuentez say: "Let me explain, let me explain." He also told Hernandez: "I thought it was you the whole time; let me explain."

V.R. testified that she and her younger brother went to sleep that night in her father's bed. When she woke up, she felt something touching her "private parts." She knew that it was a man and that it was not her father or uncle, but she did not know who the man was. She also knew the man had no clothes on. She went to her uncle's room and tried to wake him to tell him that someone was touching her in the wrong places.

The police were summoned. V.R. told one officer that a man had come into her room and started touching her in places that made her uncomfortable. Fuentez was arrested, and V.R. was taken to Midland Memorial Hospital for an examination. Cori Elaine Armstead, the nurse manager in the hospital's emergency room, examined V.R. Armstead testified that V.R. described being touched inappropriately by a man and that, in her exam, she found physical evidence of sexual penetration.

Fuentez testified that everyone at Mark's house was intoxicated. He denied knowing any children were in the house. He testified that he needed somewhere to pass out and that he went to the nearest bedroom. It was dark in the bedroom, and he did not see anyone in the bed. He went to sleep on top of the covers. He denied assaulting anyone and testified that he did not know there was a problem until he woke up the next morning.

## Issues

Fuentez challenges his conviction and sentence with four issues. He alleges, initially, that the trial court erred by granting his motion for mistrial and, second, that his retrial constituted double jeopardy. Third, Fuentez contends that the trial court erred by assessing his punishment beyond that recommended by the jury and, four, that the trial court erred by not granting his motion for an instructed verdict of not guilty.

## Discussion

### Was Fuentez Unconstitutionally Subjected to Double Jeopardy?

Fuentez's case was originally called for trial in March 2005. Fuentez had filed an application for community supervision but did not file an election to have the jury assess punishment. A jury was selected and sworn. The trial court read the indictment, and Fuentez pleaded not guilty. The State presented its opening statement. Fuentez's counsel reserved his opening.

Following a break, the attorneys conferred with the court outside the jury's presence. Fuentez's attorney announced that he had made a "major faux pas" because it had just come to his attention that

he could not get community supervision from the judge. Fuentez's attorney asked for a mistrial. The prosecutor did not oppose this request. The trial court granted the motion and discharged the jury without inquiring of Fuentez to determine if he agreed to waive his double jeopardy rights by requesting a mistrial.

Fuentez's case was called for trial again in May. Fuentez elected to have the jury assess punishment. The jury found Fuentez guilty of two counts of indecency with a child by contact. The jury assessed his punishment at five years confinement and a fine of $1,750. The jury also found that Fuentez had not been previously convicted of a felony and recommended that his confinement—but not his fine—be suspended. The trial court accepted the jury's recommendation and suspended Fuentez's confinement for ten years.

Fuentez argues that, because he did not personally agree to a mistrial and there was no manifest necessity for one, the subsequent trial violated his constitutional right to be free from double jeopardy. *See generally Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)(State may not put a defendant in jeopardy twice for the same offense); *Ex parte Fierro*, 79 S.W.3d 54, 56 (Tex.Crim.App.2002)(after a jury has been impaneled and sworn, double jeopardy generally bars a retrial if the jury is discharged without reaching a verdict). There is no dispute that Fuentez's counsel requested the mistrial. Fuentez argues that this is immaterial because a lawyer cannot give up his client's constitutional rights. That statement is true in some—but not all—instances.

Fuentez relies on *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). This was an appeal of a death

penalty sentence. Boykin pleaded guilty to the charged offenses. The trial court conducted a jury trial to assess punishment, and the jury returned a death penalty verdict. The Supreme Court reversed the sentence because the trial court accepted the guilty plea without inquiring of Boykin to insure that his guilty plea was intelligent and voluntary. *Id.* at 242, 89 S.Ct. 1709.

■ The Supreme Court did not adopt a blanket rule that no constitutional right could be waived by counsel without the individual's personal consent. The court noted that a guilty plea is more than an admission: it is a conviction. *Id.* at 242–43, 89 S.Ct. 1709. A guilty plea necessarily implicates several constitutional rights, such as the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers. *Id.* at 243, 89 S.Ct. 1709. Consequently, a trial court must determine from the defendant himself that a guilty plea is being freely, knowingly, and voluntarily given before accepting it.

Later, in *New York v. Hill,* 528 U.S. 110, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000), the court considered whether counsel could waive his client's rights to a speedy trial under the Interstate Agreement on Detainers.[1] The court noted that, as a general rule, even the most basic rights of criminal defendants are subject to waiver. *Id.* at 114, 120 S.Ct. 659.[2] Whether the defendant must participate personally in the waiver and whether the defendant's choice must be informed or voluntary depend upon the right at stake. *Id.*

The court recognized that the right to counsel and the right to plead not guilty cannot be waived by counsel without the fully informed and publicly acknowledged consent of the defendant. But, the attorney has the authority to manage the conduct of the trial, and the client is often bound by his attorney's decisions. *Id.* at 114–15, 120 S.Ct. 659. These would include decisions such as which arguments to pursue, which evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence. *Id.* at 115, 120 S.Ct. 659. The court concluded that trial scheduling fell within counsel's area of authority and that an attorney could waive his client's right to a speedy trial. *Id.*

The Texas Court of Criminal Appeals has similarly recognized that an attorney has some authority to waive his client's constitutional rights. In *Rios v. State,* 557 S.W.2d 87 (Tex.Crim.App.1977), the court held that a trial court could grant a defense attorney's motion for mistrial without first obtaining the defendant's informed and voluntary consent. *Id.* at 91. The court cited Judge Burger's comments at the 1969 National Defense Conference where he said that a defendant need make only three decisions: (1) plead guilty or not; (2) have a jury trial or not; and (3)

---

1. TEX.CODE CRIM. PROC. ANN. art. 51.14 (Vernon 1979).

2. Federal courts have, for example, held that the failure to lodge a contemporaneous objection at trial is a procedural bar to subsequent habeas corpus proceedings alleging constitutional violations. *See Cardenas v. Dretke,* 405 F.3d 244, 249 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 2986, —— L.Ed.2d —— (failure to object to potential juror's exclusion); *Rowell v. Dretke,* 398 F.3d 370, 375 (5th Cir.), *cert. denied,* —— U.S. ——, 126 S.Ct. 103, 163 L.Ed.2d 117 (2005) (failure to object to trial court's refusal to define "society" for jury); *Hogue v. Johnson,* 131 F.3d 466, 492 (5th Cir.1997)(failure to object to evidence of allegedly void conviction).

take the stand or not.[3] *Id.* To this list, one might also add: to have an attorney or not. *See Hill,* 528 U.S. at 114, 120 S.Ct. 659.

■ The *Rios* opinion indicates that the court was concerned, at least in part, with hybrid representation and the possibility that trial courts would be required to see if the defendant personally acquiesces in every tactical or strategic decision of his attorney.[4] *See Rios,* 557 S.W.2d at 91 n. 3.[5] The *Rios* opinion remains good law. During oral argument, Fuentez's counsel provided the court with a copy of *Torres v. State,* 614 S.W.2d 436 (Tex.Crim.App. 1981), to support his contention that the defendant's personal consent is required before a mistrial may be granted without giving rise to double jeopardy concerns.

In *Torres,* the trial court held a hearing outside the jury's presence to determine if a witness had been intimidated into testifying falsely. At the end of the voir dire examination, the trial court expressed its opinion that the witness had been intimidated. One of the defendant's attorneys asked the trial court to disclose what evidence it had of intimidation. That led to an exchange between the trial court and counsel, following which the trial court asked defense counsel if they wanted a retrial. One attorney indicated his desire that the trial proceed. The second stated that he could not answer the court's question until after visiting with his client. The trial court proceeded to grant a mistrial without affording the attorney an op-

portunity to confer with the defendant. The court of criminal appeals held that, under these circumstances, the defendant had not consented to a mistrial. *Id.* at 442.

This holding does not require the defendant's personal consent and is completely consistent with the court's prior decision in *Rios.* The court found a lack of consent because neither of the defendant's attorneys said yes to the trial court's offer of a mistrial. One affirmatively declined the offer, and the second wanted an opportunity to visit with the client. Because the defendant's attorneys did not agree to a mistrial, it could not be said that the defendant had agreed to a mistrial.

The reasons why a defense counsel might request a mistrial are numerous and may often require a quick decision and the benefit of legal training and experience. Counsel may make many other decisions during the course of trial which implicate the client's constitutional rights. For example, if counsel decides not to cross-examine a witness or to not object to potentially hearsay evidence, the right of confrontation is implicated, and a defendant's rights may be waived.

In *Hill,* 528 U.S. at 110, 120 S.Ct. 659, the Supreme Court recognized that the attorney must have some authority to conduct the trial. In *Rios,* 557 S.W.2d at 87, the court of criminal appeals recognized that the administration of justice requires some reliance on the attorney as the client's spokesman. If we adopted Fuen-

---

3. Warren Earl Burger served as Chief Justice of the United States Supreme Court from 1969 to 1986.

4. There is no constitutional right to hybrid representation. *Myers v. Johnson,* 76 F.3d 1330, 1335 (5th Cir.1996).

5. *See also Richardson v. State,* 666 S.W.2d 336, 339 (Tex. App.-Houston [1st Dist.] 1984, no writ)(trial court was not required to obtain defendant's personal consent before granting defense counsel's motion for mistrial because of deadlocked jury).

tez's argument, anytime a defendant's constitutional rights were potentially implicated, the trial court would be required to excuse the jury and verify the defendant's acquiescence in his attorney's decision. Such a result is impractical. Furthermore, because this does not involve one of the four basic decisions, Supreme Court authority indicates the defendant must personally make, it is not constitutionally required.[6] Fuentez's first and second issues are overruled.

### Did the Trial Court Exceed Its Authority By Placing Fuentez on Ten Years Community Supervision?

■ Fuentez argues in his third issue that the trial court erred by placing him on ten years community supervision rather than five. Fuentez argues that the trial court cannot exceed the jury's assessment and that, because it assessed his punishment at five years, the trial court was bound by that determination. The State responds that, when the jury recommended community supervision, the trial court was required to place Fuentez on community supervision but that it retained the authority to impose any period of supervision provided by TEX.CODE CRIM. PROC. ANN. art. 42.12 (Vernon Supp.2005).

Neither party has cited us to any authority addressing this particular question. A plain reading of Article 42.12, however, supports the State's position. Article 42.12, section 4 provides in relevant part:

(a) A jury that imposes confinement as punishment for an offense may recommend to the judge that the judge suspend the imposition of the sentence and place the defendant on community supervision. A judge shall suspend the imposition of the sentence and place the defendant on community supervision if the jury makes that recommendation in the verdict.

(b) If the jury recommends to the judge that the judge place the defendant on community supervision, the judge shall place the defendant on community supervision for any period permitted under Section 3(b) or 3(c) of this article, as appropriate.

Because Fuentez faced felony charges, Article 42.12, section 3(b) is applicable. It provides that the maximum period of community supervision is ten years. The trial court's decision to impose a ten-year period of community supervision, thus, is within the statutorily permitted period.

The State's position is also supported by recognition of the difference between the jury's sentence and community supervision. Fuentez is correct that the jury assessed his sentence at five years. But, their sentence was five years confinement. The jury also recommended community supervision. This is defined by Article 42.12, section 2(2) as a *suspension* of his sentence. Community supervision, therefore, is not part of the sentence—it is an arrangement in lieu of the sentence. *Speth v. State*, 6 S.W.3d 530, 532 (Tex. Crim.App.1999). We hold the trial court did not err when it imposed a ten-year period of community supervision and overrule Fuentez's third issue.

### Sufficiency of the Evidence

■ Fuentez contends in his fourth issue that the trial court erred when it

---

6. Fuentez's counsel also provided the court with legal authority concerning the steps necessary to accept a guilty plea. The Supreme Court's decisions in *Boykin*, 395 U.S. at 238, 89 S.Ct. 1709, and *Hill*, 528 U.S. at 110, 120 S.Ct. 659, make clear that some decisions are subject to stricter judicial review and that the decision to plead guilty, because of its consequence, falls within this protected area.

denied his motion for an instructed verdict at the end of the State's case. This presents a legal sufficiency challenge. *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim.App.1990). When conducting a legal sufficiency challenge, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Ross v. State*, 133 S.W.3d 618, 620 (Tex.Crim.App.2004).

The relevant evidence has been previously summarized in this opinion. Fuentez correctly notes in his brief that:

* no witness saw him with V.R.;

* V.R. could not identify him as the man who touched her;

* V.R. was not positive it was a man who touched her;

* there was no evidence that he laid on the same bed V.R. occupied; and

* he did not admit to touching V.R.

There was, however, evidence that V.R. was sexually violated. The jury heard her testimony that she woke up when some man started touching her private parts. She gave the same story to her uncle, the police, health care providers, and the jury. The hospital's examination confirmed that V.R. had sustained sexual penetration. Fuentez was indisputably in the house at the time of V.R.'s outcry and, by his admission, was sleeping in a bed in that house. By a process of elimination, the only bedroom he could have been in was the same one V.R. was sleeping in. Most importantly, the jury heard testimony that, immediately after V.R.'s outcry, Fuentez was dressed only in a pair of socks and was trying to convince Hernandez that he had an explanation and that he thought it was Hernandez the whole time.

Even if this is characterized as circumstantial evidence, the standard of review is the same. *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex.Crim.App.1999). Considering this evidence in the light most favorable to the verdict, a rational fact-finder could have found the essential elements of indecency with a child by contact beyond a reasonable doubt.

 Fuentez's brief also includes a discussion of the factual sufficiency of the evidence. When conducting a factual sufficiency review, we view all of the evidence in a neutral light, favoring neither party. *Zuniga v. State*, 144 S.W.3d 477, 481 (Tex. Crim.App.2004). The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact-finder was rationally justified in finding guilty beyond a reasonable doubt. *Id.* at 484.

The only additional evidence relevant to a factual sufficiency review is Fuentez's testimony. Fuentez denied any wrongdoing. He testified that he did not know any children were in the house but that he needed to pass out and went to the nearest bedroom. He testified that he did not see anyone on the bed and that he was unaware of any problem until the next morning.

 The jury was responsible for resolving any conflicts in the testimony and, as such, is the sole judge of the weight and credibility of the evidence. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App.2000). Because there was conflicting evidence, we may not sustain a factual sufficiency challenge unless the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484–85. Fuentez's testimony is insufficient to sus-

tain this burden on appeal. The evidence is factually sufficient to sustain the jury's verdict; and, therefore, Fuentez's fourth issue is overruled.

### Holding

The judgment of the trial court is affirmed.